**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Michael Ray ALLEN and William Joseph McMurtrey, Defendants-Appellants.**

No. 75–3486.

United States Court of Appeals, Fifth Circuit.

Sept. 7, 1976.

Rehearing and Rehearing En Banc Denied Oct. 12, 1976.

---

Nelson E. Bailey (Court-appointed), W. Palm Beach, Fla., for Allen.

George D. Gold, Miami, Fla., for McMurtrey.

Robert W. Rust, U. S. Atty., Don R. Boswell, Asst. U. S. Atty., Miami, Fla., for plaintiff-appellee.

Before DYER, SIMPSON and RONEY, Circuit Judges.

RONEY, Circuit Judge:

Michael Ray Allen and William Joseph McMurtrey appeal their convictions for knowing importation of 5,814 pounds of marijuana in violation of 21 U.S.C.A. §§ 952(a), 960(a)(1) and 18 U.S.C.A. § 2, and knowingly and intentionally possessing with intent to distribute marijuana in violation of 21 U.S.C.A. § 841(a)(1) and 18 U.S.C.A. § 2. Appellants were arrested with several other persons at a Florida waterfront home after the marijuana was discovered on a 43-foot boat behind the house.

Suppression of the marijuana's use as evidence being denied, the two appellants waived their right to a jury trial. The disposition of the charges against the various other defendants is not of concern in this appeal. Both appellants appeal the correctness of the denial of the motions to suppress, and Allen contends that the court erred in denying his defense counsel leave to withdraw. Finding no illegality in the discovery by the government agents of the marijuana, and denial to counsel of leave to withdraw to be within the trial court's discretion, we affirm.

As in most search cases the facts are essentially undisputed but important. This investigation began as a result of information received from a private citizen on May 13, 1974, by Raymond G. Magno, Special Agent in Charge of the Drug Enforcement Administration (DEA) in West Palm Beach, Florida. Agent Magno was informed that Mr. Charles Dale had purchased a $125,000 house with a $25,000 down payment and that his primary interest in purchasing this home was its facility for docking a 40-foot boat on the Intracoastal Waterway. Subsequently Agent Magno was provided with additional information that a 43-foot boat had been at the residence for one day on May 23 and had then departed. There had been several young, adult males in and out of the house who departed when the vessel left.

On May 25, 1974, Agent Magno drove past the house and observed a green Cadillac in the driveway with Missouri license plates on it. He felt the house had been abandoned. With the passage of seven days without the boat's return, Magno alerted Customs and the County Sheriff's office. He ordered 24-hour surveillance on the residence to begin on May 31, 1974, because it had been this agent's experience that a trip to and from Jamaica would take at least ten days. On June 1st, he observed, parked in front of the residence, a mobile home of the type commonly used to transport marijuana when it has been imported into this country. Magno candidly admitted that in neither of the two memoranda which he prepared regarding the above events did he ever state that either marijuana or contraband was going to be on board the boat. He had no basis upon which to apply for a search warrant for the premises or arrest warrants for any individuals.

At approximately five o'clock in the afternoon of July 7, 1974, a vessel fitting the description of the one which had been docked at the residence was spotted by Customs agents at the entrance to the Intracoastal Waterway heading in the direction

of this residence. The progress of this vessel was followed by boat and by car.

The vessel did, in fact, finally dock at the Dale residence and surveillance continued until about 6:30 that evening when the Cadillac, which had been previously parked at the residence, passed by a group of agents gathered in conference at an intersection a short distance away from the house to plan their next step. Agent Magno determined that they had been "spotted" and, being concerned that any further delay would result in a vacant residence, gave the order to "move in" on the house. The Customs agents arrived at the house in one car, the Sheriff's deputies in two more cars, and behind them was Magno and the DEA agents.

Magno recalled that as he pulled up, someone had opened the front door to the house. He called out, "Hold it, Federal agent." This person then "slammed the door." Magno went around one side of the house and three other agents went around the other side. The Sheriff's deputies and Customs officers were on their way and would guard the front.

The Customs agent asked Mr. Dale if he was the captain of the vessel. Dale merely gestured to another individual who was in the house. Thereupon, the agent entered the house through "already open" sliding doors. He approached Mr. Hailstone, flashed his identification and asked if he was the vessel's captain and if he had "come foreign." Hailstone responded affirmatively to both questions. The agent then advised Hailstone that since he had not cleared customs, he was constructively seizing his vessel. A search of the boat revealed 5,814 pounds of marijuana.

Appellants virtually concede that once the Customs agent learned from Hailstone, the captain of the vessel, that he had "come foreign" without clearing customs, the agent acted within his statutory authority in boarding the vessel. 19 U.S.C.A. § 1581(a). Once this information was obtained, the search was reasonable and based upon a reasonable belief that an entry from outside the borders of the United States had been made. *United States v. McDaniel*, 463 F.2d 129 (5th Cir. 1972), *cert. denied*, 413 U.S. 919, 93 S.Ct. 3046, 37 L.Ed.2d 1041 (1973); *Walker v. United States*, 404 F.2d 900 (5th Cir. 1968). Appellants contend, however, that the knowledge that the vessel had "come foreign" was gained by an illegal search of the house. They argue that this knowledge was "the fruit of the poisonous tree" and could not be used to support the validity of the search of the vessel. *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

We resolve the issue against appellants on the ground that they have demonstrated no violation of their constitutional rights, a prerequisite to evidence suppression. In reaching this conclusion, we assume without deciding these things: First, the intrusion by the various agents on Dale's premises was made without probable cause sufficient to withstand a claim of illegal search under the Fourth Amendment. *Ker v. California*, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963); *Theobald v. United States*, 371 F.2d 769 (9th Cir. 1967). Second, the appellants had standing to object to any tangible evidence that a search of the premises might have produced. Parenthetically, we note that at the suppression hearing the Government stipulated that it would not use as evidence certain tangible items which were taken from inside the house after discovery of the marijuana aboard the vessel. *Cf. Jones v. United States*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960); *United States v. Banks*, 465 F.2d 1235, 1240 (5th Cir.), *cert. denied*, 409 U.S. 1062, 93 S.Ct. 568, 34 L.Ed.2d 514 (1972). Third, the product of an illegal search of the premises could not have been used to validate the search of the vessel. *Wong Sun v. United States, supra.* Fourth, asking the questions of Dale and Hailstone was an invasion of their respective rights. Fifth, without the information obtained from Hailstone, the Customs agent would not have a valid reason for boarding the vessel.

We hold, however, even with these assumptions, that the information obtained

from Hailstone was not the product of a search of the *premises*. The question asked of Hailstone, although assumed to violate Hailstone's rights, did not violate the appellants' constitutional rights.

■ It is well-settled that "a Fourth Amendment violation can be successfully urged only by those whose rights were violated by the search itself, not by those who are aggrieved solely by the introduction of damaging evidence." *Alderman v. United States*, 394 U.S. 165, 171–172, 89 S.Ct. 961, 965, 22 L.Ed.2d 176 (1969). A search of the premises might have violated the appellants' rights but an individual search of the persons on the premises would not.

■ Of course, if appellants were charged with possession of the product of such individual search they could successfully suppress it as evidence. *Jones v. United States, supra*. But such is not the case here. Once the marijuana was available for use as evidence by the Government, the information received from Hailstone was no necessary part of the case against the defendants. The Government could successfully prove the charge against the defendants without introducing in evidence the Customs agent-Hailstone confrontation.

In *United States v. Breedlove*, 444 F.2d 422 (5th Cir. 1971), the police stopped a car and arrested five occupants. The three male defendants claimed an illegal arrest and suppression of the evidence found in the car. Having previously pleaded guilty, the two female occupants testified for the prosecution. Although the court held the arrest legal, it alternatively held that the three defendants had no standing to challenge the testimonial evidence of the two females obtained as a result of the arrest, even if the arrest were illegal.

> We likewise reject appellants' arguments that the testimonial evidence of the two female accomplice witnesses was the fruit of an unlawful search incident to an illegal arrest. Even assuming, arguendo, the lack of probable cause for the arrest, appellants have no standing to challenge the invasion of another's rights. As the Supreme Court has noted:

> "The established principle is that suppression of the product of a Fourth Amendment violation can be successfully urged only by those whose rights were violated by the search itself, not by those who are aggrieved solely by the introduction of damaging evidence. Coconspirators and codefendants have been accorded no special standing."

*Alderman v. United States*, 394 U.S. 165, 171, 89 S.Ct. 961, 965, 22 L.Ed.2d 176 (1969). Fourth Amendment rights are personal rights which may not be vicariously asserted. *Alderman, supra*, at 174, 89 S.Ct. 961.

444 F.2d at 424.

In *United States v. Miller*, 145 U.S.App. D.C. 312, 449 F.2d 974 (1971), the defendant challenged the drawer search in a doctor's office, to which defendant had fled. Although the court held that the defendant had standing to challenge the police officer's entry into the suite itself, it denied him standing to object to a search of the drawer. The court said:

> Appellant, however, has no standing to challenge the search that produced Dr. Roberts' gun. "The established principle is that suppression of the product of a Fourth Amendment violation can be successfully urged only by those whose rights were violated by the search itself, not by those who are aggrieved solely by the introduction of damaging evidence." *Alderman v. United States*, 394 U.S. 165, 171–172, 89 S.Ct. 961, 965, 22 L.Ed.2d 176 (1969). Of course, as a person lawfully on the premises, appellant has standing to challenge the officers' entry into the suite itself. *Jones v. United States*, 362 U.S. 257, 267, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960). But appellant's own testimony establishes that he had no authority to open or use the drawer in which the gun was found, nor is there any suggestion that the gun itself belonged to him. Consequently, even if the search or seizure of the gun were unlawful, appellant has not established that "he himself was the victim of an invasion of privacy." *Jones v.*

*United States, supra* at 261, 80 S.Ct. at 731.

449 F.2d at 977.

An analogy may be drawn between this case and wiretap cases which hold that a defendant lacks standing to suppress on constitutional grounds a wiretapped conversation to which he was not a party obtained from a wire in which he had no possessory interest. *See, e. g., Alderman v. United States, supra ; United States v. Coley,* 441 F.2d 1299 (5th Cir.), *cert. denied,* 404 U.S. 867, 92 S.Ct. 85, 30 L.Ed.2d 111 (1971). A defendant cannot suppress the fruits of a conversation between other persons overheard by the authorities. *United States v. Armocida,* 515 F.2d 29 (3d Cir. 1975).

■ Finally defendant Allen contends that at trial he was denied effective assistance of counsel. Six months after undertaking the case, and within two months of trial, Allen's retained counsel moved to withdraw. The trial court denied the motion. Allen argues that his trial attorney was not prepared and did not have the ability to prepare for the trial because the attorney disassociated with his law firm prior to trial, was not employed by another firm, did not live in the situs state of the trial, and did not have legal facilities at his disposal. Although the trial court's denial may have inconvenienced counsel, on our review of the arguments presented and of the record in this case, it is not demonstrated that Allen's trial counsel rendered ineffective assistance.

AFFIRMED.