**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Guillermo Rhodes CRUZ, Defendant-Appellant.**

No. 76–3527.

United States Court of Appeals, Fifth Circuit.

Sept. 16, 1977.

Gustavo Acevedo, Asst. Federal Public Defender, Laredo, Tex., Roland E. Dahlin, II, Federal Public Defender, Karen K. Friedman, Asst. Federal Public Defender, Houston, Tex., for defendant-appellant.

James R. Gough, U. S. Atty., Mary L. Sinderson, George A. Kelt, Jr., Asst. U. S. Attys., Houston, Tex., Rene Gonzalez, Asst. U. S. Atty., Laredo, Tex., James R. Gough, Asst. U. S. Atty., Houston, Tex., for plaintiff-appellee.

Before COLEMAN, Circuit Judge, KUN-ZIG,* Judge, and GEE, Circuit Judge.

GEE, Circuit Judge:

Appellant was convicted by a jury of conspiracy to transport illegal aliens and with three counts of transporting illegal aliens in violation of 8 U.S.C. §§ 1324(a), 1324(a)(2), and 18 U.S.C. § 371. He was sentenced to four concurrent two-year terms.[1] On appeal, he complains of the district court's failure to suppress all testimony of and about the illegal aliens as fruit of the poisonous tree because the initial stop of his car was illegal and the subsequent arrest was made without probable cause. We disagree that appellant's fourth amendment rights were violated, but even if they had been we would be unable to extend the fruit-of-the-poisonous-tree doctrine to reach the testimony appellant seeks to exclude.

On May 18, 1976, a Texas deputy sheriff driving west on State Highway 359 passed a 1966 Pontiac travelling in the same direction on the shoulder of the highway with its right-turn indicator flashing. The deputy topped the rise of an overpass approaching Laredo, but the Pontiac never came over the hill. Deputy Joseph Muldraw testified that he turned around initially to see if he could be of assistance. When he came back over the hill, he observed the Pontiac heading east. Muldraw concluded that the driver had made an illegal U-turn—illegal because made in a no-passing zone.[2] At that point he determined to stop the Pontiac to warn the driver of the violation. Deputy Muldraw was not in uniform and was not driving an official vehicle; he had to pursue the Pontiac some distance before his honking and pulling alongside the car convinced its driver to stop. Deputy Muldraw testified that prior to stopping, the Pontiac turned off State Highway 359 without signalling.

Deputy Muldraw asked appellant, the driver of the stopped car, to show him his driver's license. Appellant complied. At this point Muldraw noticed the four passengers of apparent Mexican ancestry and asked to see their papers. The passenger in the front seat produced a temporary permit known as a green card which authorizes Mexican nationals to enter the United States and remain for 72-hour periods within a 25-mile zone along the border. The three passengers in the back seat apparently could not speak English and could not produce any papers. Deputy Muldraw loaded these passengers into his pickup and ordered appellant to follow in his car. He took them into Hebbronville and turned them over to the Immigration Service. At no time did Muldraw warn appellant of any traffic violation or issue any traffic citation.

Appellant moved to suppress "any testimony of witnesses illegally obtained, or any evidence of any statements or information secured by the Government as a result of the illegal arrest and interrogation of the defendant and/or his passengers at the time of arrest or anytime subsequent thereto." He argues that the stop for the unobserved illegal U-turn was a mere pretext for inquiring into the citizenship of five persons who appeared to be of Mexican nationality. To be valid the initial stop must be authorized under state law and must not violate the United States Constitution. Texas authorizes peace officers to stop motorists who violate state highway regulations, Tex. Civ.Stat.Ann. art. 6701d § 153 (1977), but Texas courts have excluded evidence obtained upon the pretext of enforcing traffic laws. *Willett v. State*, 454 S.W.2d 398 (Tex.Cr.App.1970). The federal constitution requires reasonable suspicion based

* Judge of the United States Court of Claims, sitting by designation.

1. In addition, probation on a ninety-day sentence for a prior similar offense was revoked, and appellant was ordered to serve that sentence concurrently with the two-year sentences imposed here.

2. Tex.Rev.Civ.Stat.Ann. art. 6701d § 66 (1977). Appellant admits making the U-turn but insists that he was not within the no-passing zone at the time he turned.

on articulable facts before a roving Border Patrol officer may stop a vehicle to investigate; the scope of the inquiry must be related to the reason for the stop. *United States v. Brignoni-Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975). Appellant suggests that this part-time deputy was acting the part of a Border Patrol officer whose intent at all times was to inquire as to the nationality of the five Mexican-looking individuals in the Pontiac. Lacking reasonable suspicion to stop the vehicle, he relied on a traffic violation which he did not even observe as a pretext for stopping appellant's car. Once the deputy approached the car he never mentioned the illegal U-turn but began to request citizenship papers of the four passengers. Appellant argues that a roving deputy sheriff must be held to the same standards as a roving Border Patrol officer and that this stop, made without reasonable suspicion, violated his fourth amendment rights. Appellant suggests that Deputy Muldraw again violated the fourth amendment when he relied on the wrinkled and dishevelled appearance of the passengers to inquire about their citizenship and then to arrest them. Alleging this twofold violation of the fourth amendment, appellant urged the trial court to suppress *all* information, observation and testimony flowing from the incident as fruit of the doubly poisonous tree.

■ If the initial stop was legal, we cannot agree that it was a constitutional violation for Deputy Muldraw to request that the passengers, who aroused his suspicions by their manner of dress and their grooming,[3] produce identification. A peace officer has the duty as well as the right to investigate suspicious circumstances. *United States v. Faulkner,* 488 F.2d 328, 330 (5th Cir.), *cert. denied,* 417 U.S. 914, 94 S.Ct. 2614, 41 L.Ed.2d 218 (1974). Furthermore, if any rights had been violated by the inquiry, they would have been the constitutional rights of the passengers, and the appellant could not urge the violation of *their* rights to exclude the introduction of subsequent testimony damaging to him. *United States v. Allen,* 537 F.2d 1387, 1390 (5th Cir. 1976), *citing Alderman v. United States,* 394 U.S. 165, 171–72, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969).

■ We are more troubled by appellant's assertion that Deputy Muldraw used the unobserved illegal U-turn as a ruse to stop the vehicle for a citizenship check of its occupants.[4] Muldraw's "shifting" motives for stopping the Pontiac lend credence to appellant's theory. The deputy testified that initially he returned to offer assistance to the car which never came over the hill; then, discovering that the car was not in need of assistance, he concluded that it must have reversed its direction in a no-passing zone and should be stopped and "warned" of this traffic violation;[5] finally,

---

**3.** The following colloquy occurred at the hearing on the motion to suppress:

Defense counsel: You also indicated that you were familiar with illegal aliens, and that that made a suspicion arise in your mind that these were illegal aliens. Can you tell us what was it that prompted you to ask the people in the back for citizenship papers?
Muldraw: Well, their looks.
Defense counsel: How did they look, can you describe them?
Muldraw: Well, they weren't neatly groomed. Their clothing was different.
Defense counsel: Can you describe how their clothing was different?
Muldraw: Well, their shirts were wrinkled, their pants were wrinkled. They weren't neatly pressed or anything. They were just—
Defense counsel: Were they wearing any kind of a hat or something that you could say

it's a Mexican sombrero or Mexican serape over their shoulders, or anything like that?
Muldraw: No, sir, I can't really say.

**4.** Appellant complains that this peace officer had no authority to stop a vehicle for a violation that did not occur in his "presence," as set forth in Tex.Code Crim.Proc. art. 14.01(b) (as amended 1967), but the Texas statute has been interpreted as not requiring an officer to actually *see* an offense in order to arrest without a warrant. "The 'presence' of the officer is satisfied if the violation òccurs within reach of the officer's senses . . . ." *Taylor v. McDonald,* 346 F.Supp. 390, 394 (N.D.Tex.1972). We think that standard was satisfied here.

**5.** The government conceded at trial that Texas does not provide statutorily for the issuance of "warnings" but that such acts of mercy on the part of peace officers are common practice in the state.

he testified that as he pursued the car the driver turned left off State Highway 359 without signalling. The deputy's failure to mention any illegal turn after stopping appellant's car adds further support to the assertion that Muldraw's overriding concern was to investigate the citizenship of these five people of Mexican ancestry, not to enforce the state highway regulations. But to declare this stop a pretext we must hold that the district court was clearly erroneous in believing Deputy Muldraw and denying the motion to suppress. Appellant relies on *Amador-Gonzalez v. United States*, 391 F.2d 308 (5th Cir. 1968), where this court found the arrest for a traffic violation to be a pretext to search for suspected narcotics and therefore declared the search unreasonable. But the arresting officer in *Amador-Gonzalez acknowledged* at the suppression hearing that the real purpose for making the arrest was to search the defendant's car. *Id.* at 313 n. 3. Here Deputy Muldraw made no such admission but insisted at the suppression hearing and at trial that he stopped the defendant to warn him that he had violated a traffic regulation. Because credibility choices are the province of the district court, we always are reluctant to discredit on the basis of a written record a witness the district court, with the benefit of observing demeanor and deportment, chose to believe.

We are even more reluctant to reverse the trial court in this instance because of the legal impediments to excluding the testimony sought to be suppressed even if the stop were illegal. Appellant is not asking that physical evidence be excluded; he is asking that *all* evidence obtained as a result of the stop be excluded—the aliens' testimony that they agreed to pay appellant $200 for transporting them to various locations in the state, as well as Deputy Muldraw's observation that these aliens were riding in appellant's car and his testimony that they were unable to produce identification. We are not inclined to so extend the exclusionary rule in light of the current debate in the United States Supreme Court about the proper role of the exclusionary rule when one must balance between deterring police misconduct and protecting society by using reliable evidence to convict criminal offenders. *See Stone v. Powell*, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976).

Counsel for appellant cites this court to the Second Circuit's holding that because affidavits were insufficient to support a search warrant, testimony *of* discovered aliens must be suppressed as well as testimony *that* aliens were found. *United States v. Karathanos*, 531 F.2d 26 (2d Cir. 1976). We agree that this opinion forcefully supports appellant's attempt to exclude "animate evidence," but we decline to follow the Second Circuit's lead. Although this circuit has given lip service to the proposition that the exclusionary doctrine should exclude verbal as well as physical evidence which is obtained illegally,[6] and has actually excluded testimony of a witness who was discovered only by examining tangible evidence seized during an illegal search,[7] in *United States v. Breedlove*, where no physical evidence was seized as the result of an arrest made allegedly without probable cause, this court refused to hold that the testimony of occupants of the car could be suppressed:

> We likewise reject appellants' arguments that the testimonial evidence of the two female accomplice witnesses was the fruit of an unlawful search incident to an illegal arrest. Even assuming, arguendo, the lack of probable cause for the arrest, appellants have no standing to challenge the invasion of another's rights. . . . Fourth amendment rights are personal

---

**6.** "There can be no doubt that . . . [the] exclusionary effect [of *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1919)] applies not only to tangible evidence but also to the testimony of witnesses." *Parker v. Estelle*, 498 F.2d 625, 629 (5th Cir. 1974). *See also Gissendanner v. Wainwright*, 482 F.2d 1293 (5th Cir. 1973), *citing Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), and *Williams v. United States*, 382 F.2d 48 (5th Cir. 1967).

**7.** *Williams v. United States*, 382 F.2d 48 (5th Cir. 1967).

rights which may not be vicariously asserted.

444 F.2d 422, 424 (5th Cir. 1971) (citing *Alderman v. United States, supra*). In *United States v. Allen, supra,* this court cited *Breedlove* in distinguishing appellants' standing to object to any tangible evidence flowing from an illegal search and their lack of standing to object to *knowledge* or testimony asserted to be "fruit of the poisonous tree." 537 F.2d at 1390.

The state of the law in our circuit appears, therefore, to be that the testimony of witnesses who would not have been located at all but for examining of matter turned up in an improper search may be excluded, but not that of witnesses themselves located directly as a result of such a search. As a panel, we must, of course, leave our circuit's law where we find it established. Therefore, both because we are disinclined to extend the exclusionary rule beyond its recognized perimeters in this circuit, and because *Breedlove* and *Allen* preclude us from suppressing the testimony of the aliens and the testimony of Deputy Muldraw, we decline to overturn the district court's implied finding of fact that the stop of appellant's car was not a pretext for inquiry into the citizenship of its occupants. The conviction is

AFFIRMED.

COLEMAN, Circuit Judge, dissenting.

As the reported cases reveal, I am usually in agreement with my distinguished Brother Gee on Fourth Amendment issues. I am, however, in this instance unable to agree with the opinion which he has prepared for the Court.

The deputy sheriff claims that he stopped the automobile for an infraction which he did not see and which he only thought had happened. When he finally succeeded in stopping the vehicle he said not a word about a traffic violation, purportedly the cause of the stop in the first place.

This, in my opinion, is simply too thin. I respectfully dissent.